**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

ANNEMARIE LOCKWOOD,

                                    Case No. 2:21-cv-12891

          *Plaintiff*,               District Judge Stephen J. Murphy

*v.*                                 Magistrate Judge Patricia T. Morris

COMMISSIONER OF SOCIAL SECURITY,

          *Defendant.*

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 14, 16)**

## I.    <u>RECOMMENDATION</u>

Considering the entire record in this case, I suggest that substantial evidence supports the Commissioner of Social Security's determination that Plaintiff, Annemarie Lockwood, is not disabled.  Accordingly, I recommend that the Court **DENY** Plaintiff's motion for summary judgment, (ECF No. 14), **GRANT** the Commissioner's motion, (ECF No. 16), and affirm the decision.

## II.    <u>REPORT</u>

### A.    **Introduction and Procedural History**

The Social Security Administration found that Plaintiff was disabled in July 2010. (ECF No. 11-3, PageID.240).  However, the Agency later found that Plaintiff's disability ended on September 1, 2014.  (*Id.*)  Plaintiff appealed this decision to an ALJ, who also ultimately found that Plaintiff's disability ended in September 2014.  (*Id.* at PageID.237–64).  The Appeals Counsel declined to review the ALJ's decision.  (*Id.* at PageID.272–77).

Plaintiff protectively filed an application for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") on October 18, 2018 and March 29, 2019, respectively, alleging that she became disabled on May 1, 2017.   (ECF No. 11-2, PageID.185; ECF No. 11-5, PageID.392–93).   The Social Security Administration denied her claims on August 14, 2019.   (ECF No. 11-4, PageID.323–28, 332–36).   Plaintiff requested a hearing before an ALJ which was held on September 14, 2020.   (ECF No. 11-2, PageID.209; ECF No. 11-4, PageID.340–41).   The ALJ issued a decision on October 8, 2020, finding that Plaintiff was not disabled.   (*Id.* at PageID.182).   The Appeals Council denied review on October 14, 2021. (*Id.* at PageID.35).

Plaintiff subsequently filed a complaint seeking judicial review of the ALJ's final decision on December 10, 2021.   (ECF No. 1).   This case was referred to the undersigned the same day, and both parties later filed cross-motions for summary judgment.   (ECF Nos. 14, 16).

### B.   Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g) (2012).   The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted).   Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)

2

(internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.   Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A) (2018). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that

you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s).  If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920 (2022); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).  The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2022).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled.  *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could

perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486

F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2022)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was

not disabled.  (ECF No. 11-2, PageID.203).  At step one, the ALJ found that Plaintiff had

not engaged in substantial gainful activity since the alleged onset of disability date.  (*Id.* at

PageID.188).  At step two, the ALJ concluded that Plaintiff had the following severe

impairments: obesity, degenerative disc disease of the lumbar spine, sleep apnea, carpal

tunnel syndrome on the left, anxiety, depression, right shoulder tendinosis, left shoulder

tendinosis, adhesive capsulitis of the left shoulder, migraine, and irritable bowel syndrome.

(*Id.*)  At step three, the ALJ decided that none of Plaintiff's severe impairments met or

medically equaled a listed impairment.  (*Id.*)  Next, the ALJ determined that Plaintiff had

a residual functional capacity to perform light work,[1] except that Plaintiff could:

> lift 20 pounds maximally, 10 pounds frequently, and 20 pounds occasionally;
> sit for six hours, and stand/walk for six hours in an eight-hour workday;
> should never climb ladders, ropes, or scaffolds; could only occasionally
> climb ramps or stairs, stoop, crouch, kneel, crawl, or balance; should avoid
> concentrated exposure to extreme heat, extreme cold, wetness, humidity, and
> vibrations; should avoid concentrated exposure to fumes, odors, dust, gases,
> or poor ventilation; could not reach over the shoulder with the left upper
> extremity; could frequently handle, finger, and feel with the left or right
> upper extremity; would need to avoid concentrated exposure to dangerous
> unprotected machinery or work at unprotected heights; could occasionally
> bend, twist, or turn at the waist; could do no commercial driving; could not
> push or pull with the left upper extremity; could do work involving one, two,
> or three step instructions; work involving only occasional contact with co-

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects
weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when
it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing
and pulling of arm or leg controls."  20 C.F.R. §§ 404.1567(b), 416.667(b) (2022).

workers; work requiring occasional contact with the general public; routine work that does not require changes or adaptations in work settings or duties more than once per month; and jobs without production quotas mandating a specific number of pieces per hour or with a down-line coworker depending on Claimant's productivity.

(ECF No. 10, PageID.192).  At step four, the ALJ found that Plaintiff could not perform her past relevant works as a social worker.  (*Id.* at PageID.201).  Finally, at step five, the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy.  (*Id.*)

### E.  Background

#### 1.  Medical Evidence

Plaintiff alleges that she cannot work primarily because of her fatigue and poor mental health.  (ECF No. 11-2, PageID.220, 227).  She attended therapy for her depression and anxiety throughout the relevant period took various antidepressants to manage her symptoms.  (*Id.* at PageID.198–200).  Upon examination, Plaintiff generally displayed symptoms of "moderately severe" depression—she would often appear tearful, angry, depressed, or "fidgety."  (*Id.*)  However, Plaintiff consistently reported that she was not suicidal; denied psychotic symptoms such as "delusions, hallucinations, or preoccupations"; and demonstrated normal cognitive functioning.  (*Id.*)

In 2017, the prior ALJ found that Plaintiff also suffered from bipolar disorder and a personality disorder.  (ECF No. 11-3, PageID.242, 251, 257).  Though neither the ALJ, nor the parties, identify any medical evidence of Plaintiff's bipolar disorder, Plaintiff has been treated for borderline personality disorder.  (ECF No. 11-8, PageID.1049).

Apart from her psychological impairments, Plaintiff also believes that her exposure to mold has exacerbated her fatigue and mental health symptoms.   Throughout the record, plaintiff reports that she lives in a home with "toxic mold."  (ECF No. 11-2, PageID.193; *e.g.*, ECF No. 11-7, PageID.802). Plaintiff has also tested positive for a genetic mutation that can increase her risk for developing illness from mold exposure.  (ECF No. 11-7, PageID.558, 635).  However, other testing in the record suggest that this mutation may have had little to no impact her resistance to mold exposure.  (*See* ECF No. 11-2, PageID.195; ECF No. 11-7, PageID.635; ECF No. 11-8, PageID.1298).  Moreover, the record contains no "medical findings regarding" her mold exposure nor "any" evidence of "lasting medical effects" that might be attributed to mold exposure.  (ECF No. 11-2, PageID.193).

### 2.  Plaintiff's Testimony at the Administrative hearing

The ALJ began the hearing by examining Plaintiff.  (*Id.* at PageID.216).  Plaintiff told the ALJ that the "biggest problem[s]" preventing her from working were her "fatigue and depression."  (*Id.* at PageID.220, 227).  Plaintiff explained that she took a "variety of antidepressant medications" and met with a "counselor" at a mental health clinic.  (*Id.* at PageID.220–21).  Her symptoms made it difficult her to "concentrate[e]" and "complet[e] tasks."  (*Id.* at PageID.224).  For example, Plaintiff would forget about items she began cooking on the stove, and because of her fatigue, Plaintiff could not perform a task for more than ten minutes without needing to take a break.  (*Id.* at PageID.224, 227–28).  Because she struggled to complete tasks, she shared many of her household chores with

her adult son.  (*Id.* at PageID.226).  Plaintiff did not testify about her mold exposure.  (*Id.*

at PageID.216–28).

### 3. The Vocational Expert's Testimony at the Administrative Hearing

After Plaintiff testified, the ALJ questioned the vocational expert ("VE").  (*Id.* at

PageID.228.)  The ALJ asked the VE to assume a hypothetical person who could:

> lift [twenty] pounds maximum, [ten] pounds frequently, [twenty] pounds
> occasionally.  Sit [six] hours of an [eight]-hour shift.  Never use a ladder,
> scaffolds, or ropes.  Could only occasionally use ramps or stairs, stoop,
> crouch, kneel, crawl, or balance.  Must avoid concentrated exposure to
> extreme heat, extreme cold, wetness, humidity, and vibrations.  Avoid
> concentrated exposure to fumes, odors, dust, gases, or poor ventilation.  No
> reaching over the shoulder with the left upper extremity, who can only
> frequently handle, finger, or feel with the right or left upper extremity.  Avoid
> concentrated exposure to dangerous, unprotected machinery, [and] all work
> at unprotected heights.  Only occasionally bend, twist, turn at the waist.  No
> commercial driving.  No pushing or pulling with the left upper extremity.
> Work involving only [one], [two], or [three]-step instructions.   Work
> involving only occasional contact with coworkers.  Work requiring only
> occasional contact with the general public.  Routine work that will not require
> changes or adaptations in work settings or duties more than once a month.
> Jobs without production quotas mandating a specific number of pieces per
> hour, or downline coworker depending on claimant's productivity.

(*Id.* at PageID.229–30).  The ALJ then asked the VE a hypothetical individual with those

same limitations and the same age, education, and work history as Plaintiff could find work

that existed in significant numbers in the national economy.  (*Id.* at PageID.230).  The VE

responded that such a n individual could work as a scrap sorter, Dictionary of Occupational

Titles ("DOT") code 788.687-106, unskilled, light work, approximately 200,000 jobs; an

inspector, DOT code 727.87-062, unskilled, light work, approximately 200,000 jobs; and

a merchandise marker, DOT code 209.587-034, unskilled, light work, approximately 270,000 jobs.  (*Id.* at PageID.230).

The ALJ then asked the VE whether his testimony was consistent with the DOT. (*Id.* at PageID.230).  The VE explained that his testimony was generally consistent, except that the DOT did not address certain aspects of the hypothetical, such as "interaction with others" and "downline worker dependency."  (*Id.* at PageID.230–31).  Where the VE did not rely on the DOT, she relied on her professional experience and the "Bureau of Labor Statistics' Occupational Outlook Handbook Data.  (*Id.* at PageID.231).

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision.  42 U.S.C. § 423(d)(5)(B) (2018).  The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed Psychologist, which includes:

    (i)    A licensed or certified psychologist at the independent practice level; or

    (ii)    A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a) (2022).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.* § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2)

Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy."  *Id.*

The Social Security Administration ("SSA") "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources."  *Id.* § 404.1520c(a).   "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)."  *Id.*  The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case.  *Id.*

Of these factors, the first is "supportability."  This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]"  *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim.  This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]"  *Id.* § 404.1520c(c)(2).

11

In addition, the SSA will consider the "[r]elationship with claimant[.]"   *Id.*
§ 404.1520c(c)(3).  This factor will include the analysis of:

(i)     Length of the treatment relationship. The length of time a medical
        source has treated you may help demonstrate whether the medical
        source has a longitudinal understanding of your impairment(s);

(ii)    Frequency of examinations. The frequency of your visits with the
        medical source may help demonstrate whether the medical source has
        a longitudinal understanding of your impairment(s);

(iii)   Purpose of the treatment relationship. The purpose for treatment you
        received from the medical source may help demonstrate the level of
        knowledge the medical source has of your impairment(s);

(iv)    Extent of the treatment relationship. The kinds and extent of
        examinations and testing the medical source has performed or ordered
        from specialists or independent laboratories may help demonstrate the
        level of knowledge the medical source has of your impairment(s);

(v)     Examining relationship. A medical source may have a better
        understanding of your impairment(s) if he or she examines you than
        if the medical source only reviews evidence in your folder[.]

*Id.*   The fourth factor of the SSA's analysis is "specialization."   In making this
determination, the SSA will consider "[t]he medical opinion or prior administrative
medical finding of a medical source who has received advanced education and training to
become a specialist may be more persuasive about medical issues related to his or her area
of specialty than the medical opinion or prior administrative medical finding of a medical
source who is not a specialist in the relevant area of specialty."  *Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors."  These may include any other factors
that "tend to support or contradict a medical opinion or prior administrative medical
finding."  *Id.* § 404.1520c(c)(5).  "This includes, but is not limited to, evidence showing a
medical source has familiarity with the other evidence in the claim or an understanding of

our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.* § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors

13

we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by

a State agency disability examiner made at a previous level of adjudication about a medical

issue, vocational issue, or the ultimate issue about whether you are disabled;" and

"[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)     Statements that you are or are not disabled, blind, able to work, or able
        to perform regular or continuing work;

(ii)    Statements about whether or not your impairment(s) meets or
        medically equals any listing in the Listing of Impairments[];

(iii)   Statements about what your residual functional capacity is using our
        programmatic terms about the functional exertional levels [] instead
        of descriptions about your functional abilities and limitations[];

(iv)    Statements about whether or not your residual functional capacity
        prevents you from doing past relevant work[];

(v)     Statements that you do or do not meet the requirements of a medical-
        vocational rule[]; and

(vi)    Statements about whether or not your disability continues or ends
        when we conduct a continuing disability review[.]

*Id.* § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental

and nongovernmental entity about whether you are disabled, blind, employable, or entitled

to any benefits is based on its rules, it is not binding on us and is not our decision about

whether you are disabled or blind under our rules."  *Id.* § 404.1504.   Therefore, the

Commissioner "will not provide any analysis in our determination or decision about a

decision made by any other governmental or nongovernmental entity about whether you

are disabled, blind, employable, or entitled to benefits."  *Id.*   The Commissioner will,

however, "consider all of the supporting evidence underlying the other governmental or

nongovernmental entity's decision that we receive as evidence in your claim[.]"  *Id.*

15

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f).  Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.*  Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain.  "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.* § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.* § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.* § 404.1529(a). The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." *Id.* § 404.1529(c)(3). This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living),"

17

which "is also an important indicator of the intensity and persistence of your symptoms."
*Id.*

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.* The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.*

§ 404.1530(b).  Acceptable (or "good") reasons for failure to follow prescribed treatment

include:

> (1)   The specific medical treatment is contrary to the established teaching and tenets of your religion;
>
> (2)   The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;
>
> (3)   Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;
>
> (4)   The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or
>
> (5)   The treatment involves amputation of an extremity, or major part of an extremity.

*Id.* § 404.1530(c).

### G. Arguments and Analysis

Plaintiff argues that the ALJ erred by failing to consider her bipolar disorder,

personality disorder, and mold exposure at steps three to five.  Specifically, she argues that

the ALJ did not rely on substantial evidence at step two when he failed to find that these

mental impairments were severe, rather than nonsevere, and when he failed to find that her

mold exposure was a medically determinable impairment.  (ECF No. 14, PageID.2065–66,

2070–71).   This, Plaintiff explains, led the ALJ to proceed through the sequential

evaluation without considering these impairments.  (*See id.* at PageID.2060, 2065–66,

2072).   Alternatively, she appears to suggest that even if the record did not contain

substantial evidence that her mental impairments were severe, the ALJ was required to

19

adopt the prior ALJ's findings from her previous application that her bipolar disorder and personality disorder were severe impairments. (*Id.* at PageID.2060, 2066).

Before proceeding further, I note that much of Plaintiff's argument is based on an incorrect reading of the record. Plaintiff appears to believe that the prior ALJ found that all of her mental impairments—her depression, anxiety, bipolar disorder, and personality disorder—were severe impairments. (*Id.* at PageID.2059). That is not so. The prior ALJ found that each of these impairments were nonsevere, yet medically determinable, impairments. (ECF No. 11-3, PageID.242, 251, 257 ("The claimant does not have a severe mental impairment or combination of mental impairments.")). Plaintiff also asserts that the current ALJ found that her anxiety and depression were severe, but that her bipolar and personality disorders were nonsevere but medically determinable. (*See* ECF No. 14, PageID.2056–57, 2065–66). Again, that is not accurate. While the ALJ below did find that Plaintiff's depression and anxiety were severe impairments, he did not find that her bipolar disorder or personality disorder were medically determinable. (*See* ECF No. 11-2, PageID.188).

Further, much of Plaintiff's argument is "legally irrelevant." *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 852 (6th Cir. 2020). At step two, an ALJ must consider whether the claimant has any severe, medically determinable impairments. 20 C.F.R. § 404.1520(a)(4)(iii) (2022). Once an ALJ finds one severe impairment, he or she must consider all of the claimant's medically determinable impairments, whether severe or nonsevere, throughout the rest of the analysis. *Emard*, 953 F.3d at 852 (quoting *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008)). The ALJ need not, however, consider

any impairments that are not medically determinable.   20 C.F.R. § 404.1520(a)(2).

Because the ALJ here found multiple severe impairments, any error in failing to find that

Plaintiff's bipolar disorder or personality disorder were severe impairments would have

been harmless.  *See Emard*, 953 F.3d at 852.

Accordingly, the Court need only consider whether the ALJ should have found that

Plaintiff's bipolar disorder, personality disorder, or mold exposure were medically

determinable impairments.   Plaintiff's arguments, therefore, are better construed as

follows: (1) the ALJ did not rely on substantial evidence when he found that Plaintiff's

bipolar disorder, personality disorder, and mold exposure were not medically determinable

impairments; and (2) because the current ALJ did not cite any evidence of a material

change in Plaintiff's mental health, the ALJ should have adopted, by default, the prior

ALJ's finding that Plaintiff's mental impairments were medically determinable.

### 1.    Medically Determinable Impairments

I suggest that the ALJ did not err by finding that Plaintiff's bipolar disorder,

personality disorder, and mold exposure were not medically determinable impairments,

and therefore he need not have considered these impairments at steps three through five.

The regulations only require ALJs to consider impairments which are medically

determinable when evaluating the listings or a claimant's RFC.  *See Rouse v. Comm'r of

Soc. Sec.*, No. 16-0223, 2017 WL 163384, at *4 (S.D. Ohio Jan. 17, 2017).  A medically

determinable impairment is one that "result[s] from anatomical, physiological, or

psychological abnormalities" and "can be shown by medically acceptable clinical and

laboratory diagnostic techniques."  20 C.F.R. § 404.1521 (2022).  Accordingly, to be

considered "medically determinable," an impairment "must be established by objective medical evidence from an acceptable medical source." *Id.* Objective evidence refers to medical "signs" or "laboratory findings"—an ALJ may not use diagnoses, medical opinions, or a claimant's self-reported symptoms "to establish the existence of" a medically determinable impairment. *Id.* §§ 404.1502(f), 404.1521 (2022).

For example, in *Sesberry v. Astrue*, the Middle District of Florida held that a claimant could not establish that his depression was a medically determinable impairment because the only evidence of his depression consisted of self-reported symptoms and treatment. No. 3:08-cv-989-J-TEM, 2010 WL 653890, at *4 (M.D. Fla. Feb. 18, 2018). The record mentioned his depression only twice: once, when Plaintiff told the consultative examiner that he had "a past medical history of . . . depression, and again, when he told his physician that he "had trouble sleeping due to '[h]is emotional state' and [that] at times he feels depressed . . . .'" *Id.* at *3. Based only on the claimant's self-reported symptoms, the claimant's physician opined that he had an "adjustment disorder," prescribed him an antidepressant, and referred him for a psychological evaluation—the results of which were not included in the record. *Id.* The court reasoned that the ALJ could not rely on the claimant's self-reported symptoms to find that the claimant's depression was medically determinable. *Id.* at *4. And, because the physician based his evaluation "solely on [the claimant's own statement of symptoms," it could "not constitute laboratory findings or medically acceptable diagnostic techniques . . . ." *Id.*

Likely because Plaintiff mistakenly believes that the ALJ found her bipolar and personality disorders to be nonsevere impairments, she does not identify any objective

evidence from which the ALJ could have found that these impairments were medically determinable.  The closest Plaintiff comes to identifying any objective evidence of these impairments is her report to a mental treatment provider that she was previously diagnosed and treated for borderline personality disorder.  (ECF No. 14, PageID.2064–65 (citing ECF No. 11-8, PageID.1049)).  But diagnoses and treatments are not objective evidence of an impairment, and therefore they cannot establish that an impairment is medically determinable.  *See Brent v. Comm'r of Soc. Sec.*, No. 17-12654, 2018 WL 5118598, at *8 (E.D. Mich. Aug. 21, 2018), *report and recommendation adopted by Brent v. Comm'r of Soc. Sec.*, No. 17-12654, 2018 WL 4403418 (2018); *Sessberry*, 2010 WL 653890, at *4. Plaintiff also claims that the record contains "constant complaints of issues related to mold exposure and hypersensitivity and preoccupation with mold exposure."  (ECF No. 14, PageID.2064).  But this argument contradicts her parallel assertion that her mold exposure was a legitimate and medically determinable impairment.  (*Id.* at PageID.2069–72).  And setting Plaintiff's inconsistent arguments aside, she does not explain why her preoccupation with mold exposure would be evidence of bipolar disorder, a disease characterized by "extreme mood swings."  *Bipolar Disorder*, Mayo Clinic (Feb. 16, 2021), https://www.mayoclinic.org/diseases-conditions/bipolar-disorder/symptoms-causes/syc-20355955.  Likewise, Plaintiff does not explain how her preoccupation might indicate that she has personality disorder.

Moreover, while the ALJ does discuss some objective evidence of mental illness when addressing the severity of Plaintiff's anxiety and depression, Plaintiff does not argue that this evidence might also be sufficient for the ALJ to have found that her bipolar and

personality disorder were medically determinable.  In fact, Plaintiff implies that there would be little overlap, if any, between the objective evidence of bipolar or personality disorders, and any evidence of depression or anxiety.  (*See* ECF No. 14, PageID.2061–63, 66 (arguing that the evidence relied on by the ALJ when discussing Plaintiff's depression and anxiety did "not adequately address symptoms related to Plaintiff's personality/behavioral disorder")).

Thus, Plaintiff neglects to identify any objective evidence of these mental impairments, and the Court need not consider issues which are undeveloped by the parties. Indeed, the record is over two thousand pages long, and neither the undersigned, nor the Court, need scour the record to develop Plaintiff's argument for her.   *Thomas v. Halter*, 131 F. Supp. 2d 942, 945 (E.D. Mich. 2001) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).  Because Plaintiff does not meaningfully challenge the ALJ's finding that her mental impairments were not medically determinable, I suggest that she has waived this argument, and the ALJ did not err by failing to consider these impairments at steps three through five.[2]  *See Sabbota v. Comm'r of Soc. Sec.*, No. 17-12477, 2018 WL

---

[2] Plaintiff also argues that, at a minimum, the ALJ should have articulated his rationale for finding that her mental impairments were not medically determinable.  An ALJ need only articulate his or her reasoning well enough to allow a reviewing court to understand the basis for his or her decision.  *Bailey v. Comm'r of Soc. Sec.*, No. 98-3061, 1999 WL 96920, at *3–4 (6th Cir. 1999) (quoting *Hurst v. Sec'y of Health & Human Servs.*, 753 F .2d 517, 519 (6th Cir. 1985)).  Here, because Plaintiff does not identify any evidence from which the ALJ could make this finding, I suggest that the ALJ had no reason to explain why he did not find that Plaintiff's mental impairments were medically determinable.  Indeed, if the record contains no evidence that the ALJ could have relied on to find that either impairment was medically determinable, then his step two discussion is sufficiently detailed for the Court to understand the basis of his findings.  *See Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006); *cf. Moody v. Comm'r of Soc. Sec.*, No. 2:20-cv-13122, 2022 WL 1252403, at *11 (E.D. Mich. Mar. 17, 2022), *report & recommendation adopted by* 2022 WL 1251010 (E.D. Mich. Apr. 27, 2022).  Moreover, although Plaintiff asserts otherwise, 20 C.F.R. § 1520c does not require ALJ's to explain how they considered decisions from other ALJs in prior

24

3626150 at *3 (E.D. Mich. July 5, 2018) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)), *report & recommendation adopted by* 2018 WL 3626150 (E.D. Mich. July 30, 2018).

Plaintiff's argument that her mold exposure was a medically determinable impairment fares no better. Plaintiff points to testing which established that she has a genetic predisposition to mold sensitivity, and she notes that various doctors have diagnosed her with mold exposure, at least one of whom observed that Plaintiff appeared "chronically ill," pale, and fatigued. (*E.g.*, ECF No. 11-7, PageID.558; ECF No. 11-9, PageID.1965–66). From this, Plaintiff argues that the ALJ should have found that her mold exposure was a medically determinable impairment. However, Plaintiff cannot rely on her diagnoses to establish that her mold exposure is a medically determinable impairment, and her physical symptoms are not specific to mold exposure. 20 C.F.R. §§ 404.1502(f), 404.1521. At most, Plaintiff provides objective evidence from which the ALJ could find that she was *predisposed* to developing mold-related illness. But even here, the ALJ recognized that while Plaintiff had a genetic mutation which could increase her risk of developing a mold related illness, the record contains test results which suggest that Plaintiff's mutation had not actually impacted her health in such a way that she would be more prone to becoming ill from mold exposure. (ECF No. 11-2, PageID.193, 195, 199; ECF No. 11-7, PageID.635; ECF No. 11-8, PageID.1298). Indeed, the ALJ acknowledged that Plaintiff had been treated for a mold exposure, and that she tested positive for a genetic

---

applications—this regulation applies only to medical opinions and prior administrative medical findings. 20 C.F.R. § 404.1520c. *See generally* 20 C.F.R. §§ 404.1513a(5), 404.1513a(b)(1).

mutation of her MTHFR gene which could increase her risk of developing a mold related exposure.  (ECF No. 11-2, PageID.193, 199).  However, he noted that although MTHFR mutations like Plaintiff's generally inhibit the body's ability to break down a substance called "homocysteine," Plaintiff's homocysteine levels were "normal," suggesting that her mutation may not have impacted her resistance to mold.  (*Id.* at PageID.195).  *See generally MTHFR Mutation Test*,  MedlinePlus, https://medlineplus.gov/labtests/mthfrmutationtest/#:~:text=The%20MTHFR%20gene%2 0helps%20your,other%20substances%20your%20body%20needs  (last updated August 26, 2021).  Moreover, even if Plaintiff could establish that she is at risk for becoming ill from exposure to mold, that would not be the same as establishing that she had actually been exposed to mold and developed an illness, and the ALJ correctly recognized that the record contained no "medical findings regarding [mold exposure] or any lasting medical effects" attributable to mold exposure.  (ECF No. 11-2, PageID.193).  Thus, the ALJ reasonably found that Plaintiff's mold exposure was not a medically determinable impairment.

### 2.   Whether the ALJ Should Have Adopted the Prior ALJ's Findings that Plaintiff's Bipolar and Personality Disorders Were Medically Determinable Impairments

I also suggest that the ALJ need not have adopted the prior ALJ's findings that Plaintiff's bipolar and personality disorders were medically determinable impairments.  In *Dennard v. Sec'y of Health & Hum. Servs.*, the Sixth Circuit held that an ALJ was "precluded by estoppel" from reconsidering whether a claimant could perform his past relevant work after another ALJ, deciding an earlier application, determined that the

claimant could perform his past relevant work.  907 F.2d 598, 600 (6th Cir. 1990).

Subsequently, the Social Security Administration promulgated SSAR 98-3(6) which

interpreted *Dennard* and instructed ALJs that they "must adopt" findings from earlier

decisions, "unless there is new and material evidence relating" to the prior ALJ's finding.

SSAR 98-3(6), 1998 WL 28390, at *3.  The ruling applied even where a new application

alleged disability during a timeframe that succeeded the earlier application.  *See id.*

 After *Dennard*, the Sixth Circuit decided *Drummond v. Comm'r of Soc. Sec.*, which,

relying partially on Court's holding in *Dennard*, explicitly held that where an ALJ makes

a final determination concerning a claimant's entitlement to benefits, all of the ALJ's

*findings* are binding on the parties in all subsequent applications absent evidence of a

"changed condition."  126 F.3d 837, 842 (6th Cir. 1997).  The *Drummond* Court reasoned

that "principles of res judicata" and "collateral estoppel" prevent ALJs from challenging

earlier findings, absent changed circumstances.  *Id.* at 840–42.[3]  In several unpublished

decisions following *Drummond*, the Sixth Circuit applied this rule even where the new

application concerned periods of time that were not addressed by the Administration's prior

decision.  *See, e.g.*, *Lester v. Soc. Sec. Admin.*, 596 F. App'x 387, 389 (6th Cir. 2015);

*Haun v. Comm'r of Soc. Sec.*, 107 F. App'x 462, 464 (6th Cir. 2004).

 However, in *Earley v. Comm'r of Soc. Sec.*, the Sixth Circuit significantly restricted

the scope of *Drummond* and *Dennard*.  The Sixth Circuit explained that the *Drummond*

---

[3] The Social Security Administration promulgated SSAR 98-4(6), 1998 WL 283902 (June 1, 1998), interpreting *Drummond*, on the same day that it promulgated SSAR 98-3(6).  The instructions in SSAR 98-4(6) are identical to those in SSAR 98-3(6).

Court "overstate[d]" how res judicata applied to subsequent applications. 893 F.3d 929, 933 (6th Cir. 2018). The *Earley* Court held that while the *Drummond* Court was correct that "res judicata may apply to administrative proceedings," res judicata only prevented subsequent applications "for the same period of time," that was considered in the prior application. *Id.* Thus, ALJ's are not bound by prior findings when considering periods of disability that succeed the time period adjudicated in the earlier decision. *Id.* Indeed, because "human health is rarely static" an "earlier proceeding . . . could rarely, if ever, have 'actually litigated and resolved' whether a person was disabled at some later date." *Id.* Thus, ALJ's must "giv[e] a fresh look" to periods of disability that were not addressed in the prior ALJ's decision. *Id.* at 931, 934. Still, an ALJ at a later hearing need not "ignore" a prior ALJ's findings—"[a] later [ALJ] may" at least "consider what an earlier ALJ did . . . ." *Id.* at 934. An applicant whose "second filing mimics the first one" should "not have high expectations about success." *Id.* at 933.

Under *Earley*, a "fresh review" of the evidence is a review that treats decisions from prior applications as persuasive, but not binding, even "absent" a material change in the claimant's condition. *Id.* at 933–34. Although an ALJ may, and generally should, make findings that are consistent with those in earlier applications, an ALJ need not necessarily do so—even where a subsequent application contains *no* "new and material evidence," an ALJ is not bound by any findings from prior applications. *Id.* Although it may often be the case that a decision will not be supported by substantial evidence where the ALJ strays from a prior ALJ's findings, *Earley* instructs that a new ALJ is not bound by a prior ALJ's findings when considering a different period of time. *Id.* (citing *Lively v. Sec'y of Health*

*& Hum. Servs.*, 820 F.2d 1391, 1391–92 (4th Cir. 1987)).

A prior decision is simply "precedent," not an anchoring point for all subsequent applications. *Id.* at 933–34. An ALJ may choose to completely ignore a prior ALJ's finding and assign a different RFC if supported by substantial evidence. *See id.* at 933. And an ALJ may also "take the view that" he or she will not deviate from a prior findings absent any "material" changes to Plaintiff's conditions. *See id.* at 931, 933–34. Thus, to comply with *Earley*, an ALJ must, at a minimum, recognize that he or she has the option to choose between these two approaches. *See id.* Where an ALJ feels that he or she can deviate from a prior ALJ's findings *only if* the record contains evidence of a material change in the claimant's condition, the ALJ usurps the claimant of the possibility that the ALJ might choose to depart from the prior ALJ's findings, even "absent new and additional evidence."[4]

Accordingly, here, the current ALJ was not bound by the prior ALJ's findings. The current ALJ was free to adopt or reject the prior ALJ's findings, even without a material change in Plaintiff's mental health. And because the ALJ believed that Plaintiff's health changed since her last application, he had little reason to defer to the prior ALJ's findings. Moreover, for the reasons discussed previously, the current ALJ's findings were supported

---

[4] For that reason, I do not agree with the Commissioner's argument that the prior ALJ gave a "fresh look" to the new evidence in the record simply because he discussed the new evidence at length. (ECF No. 16, PageID.2086 n.1). Discussing evidence is not the same as considering evidence, and because the ALJ here felt that he could only depart from the prior ALJ's findings where he found "new and material evidence" of a change in Plaintiff's condition, he did not apply the correct standard. (ECF No. 11-2, PageID.186); *see Earley*, 893 F.3d at 933–34. Nonetheless, any error here was harmless. The ALJ found that there was "new and material evidence" in the record and departed from nearly all of the prior ALJ's findings, adopting an RFC that was more favorable to Plaintiff. (*Compare* ECF No. 11-2, PageID.186, 188, 191, *with* ECF No. 11-3, PageID.242, 259).

by substantial evidence, even if they deviated from the "precedent" established by the prior decision. *Earley*, therefore, did not require the ALJ to adopt the prior ALJ's findings that Plaintiff's personality disorder and bipolar disorder were medically determinable impairments. Accordingly, because the ALJ reasonably found that Plaintiff's mold exposure, personality disorder, and bipolar disorder were not medically determinable impairments, and because the ALJ need not have adopted the prior ALJ's findings to the contrary, the ALJ did not err by declining to discuss, or consider, the effects of these impairments on Plaintiff's RFC.

### H.  Conclusion

For these reasons, I conclude that substantial evidence supports the ALJ's decision. Consequently, I recommend **DENYING** Plaintiff's Motion, (ECF No. 14), **GRANTING** the Commissioner's Motion (ECF No. 16), and affirming the decision.

## III.  <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have

to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  August 2, 2022                                    S/ PATRICIA T. MORRIS
                                                         Patricia T. Morris
                                                         United States Magistrate Judge